# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BILLY JOE WARRICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:13-cv-00346** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks review of the Social Security

Administration Commissioner's decision denying Plaintiff's application for supplemental

security income ("SSI") under Title XVI of the Social Security Act ("Act"). The Magistrate

Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (DE

15)[1] be **GRANTED**, the Commissioner's decision be **VACATED**, and that the case be

**REMANDED** for further proceedings consistent with this Report and Recommendation.

## I.     PROCEDURAL HISTORY

Prior to this action, Plaintiff requested and was denied period of disability, disability

insurance benefits ("DIB"), and SSI on August 17, 2009. (DE 13, pp. 24, 71–84).[2] This decision

became the Commission's final determination when the Appeals Council declined review on

March 21, 2011. (DE 13, pp. 109–111).[3]

---

[1] "DE" refers to Docket Entry.
[2] Page citations refer to the Bates Stamp on each page of the Administrative Record.
[3] In determining that Plaintiff was "not disabled" within the meaning of the Act, the administrative law judge
("ALJ") in the 2009 decision determined that Plaintiff's residual functional capacity ("RFC") permitted Plaintiff to

With respect to the pending case, Plaintiff filed a protective Title XVI application for SSI and a Title II application for period of disability and DIB on January 19, 2010. (DE 13, pp. 168–175). In each application, Plaintiff stated his disability began on August 13, 2009. (DE 13, pp. 168, 172). These claims were initially denied on July 12, 2010, and were again denied upon reconsideration on September 8, 2010. (DE 13, pp. 85–105).

At Plaintiff's request, the administrative law judge ("ALJ") held a hearing on February 2, 2012. (DE 13, pp. 40–66, 106–107). Present were Mr. David M. Boatner, M.Ed.,[4] a vocational expert ("VE"), and Mr. Carl W. Groves, Jr., Plaintiff's non-attorney representative. (DE 13, p. 23). During the hearing, Plaintiff amended the alleged onset date to January 11, 2010. (DE 13, pp. 43, 184). As Plaintiff did not have disability insured status on the amended date of onset, this change precluded Plaintiff from seeking period of disability and DIB under Title II of the Act. (DE 13, pp. 23, 43). The ALJ subsequently dismissed Plaintiff's Title II claims and solely proceeded under Plaintiff's Title XVI request for SSI. (DE 13, pp. 23, 43).

On February 22, 2012, the ALJ issued an unfavorable decision based on the following findings of fact and conclusions of law:

(1) The claimant meets the insured status requirements of the Act through December 31, 2008.

(2) The claimant has not engaged in substantial gainful activity ("SGA") since January 11, 2010, the alleged onset date.

---

perform a full range of work at any exertion level. (DE 13, pp. 24, 78). Due to Plaintiff's seizure disorder, however, he could not climb ladders, ropes, or scaffolds, and Plaintiff needed to avoid concentrated exposure to workplace hazards such as moving machinery. (DE 13, pp. 24, 78). Further, the ALJ found that Plaintiff could hear a normal conversation within fifteen feet but that Plaintiff should avoid concentrated exposure to loud noise. (DE 13, pp. 24, 78). Despite mental limitations, Plaintiff could still understand, remember, and carry out simple and detailed directions; could maintain concentration and the persistence required to perform simple and detailed tasks; could interact with the general public, co-workers, and supervisors; required supervision on occasion; and could adapt to routine, infrequent changes in the workplace. (DE 13, pp. 24, 78).
[4] Masters of Education in Vocational Rehabilitation. (DE 13, p. 159).

(3) The claimant has the following severe impairments: bipolar disorder, carotid artery stenosis,[5] hypertension, obesity, history of cerebrovascular disease, post right carotid endarterectomy[6] with history of transient ischemic attacks, history of seizure disorder, and bilateral hearing loss.

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.

(5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity ("RFC") to perform light work[7] as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he would require the ability to alternate between sitting and standing at 1-hour intervals. The claimant should not work around moving machinery or unprotected heights and should not climb, balance, or drive. The claimant should avoid concentrated exposure to loud noises but would be able to hear normal conversation. Additionally, the claimant could perform simple, 1-2 step routine and repetitive work with things rather than people and have occasional contact with the public.

(6) The claimant is unable to perform any past relevant work.

(7) The claimant was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

(8) The claimant has at least a high school education and is able to communicate in English.

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

(10) Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(11) The claimant has not been under a disability, as defined in the Act, from January 11, 2010, through the date of this decision.

(DE 13, pp. 26–34).

---

[5] Stenosis: "an abnormal narrowing of a duct or canal." Dorland's Illustrated Medical Dictionary 1769 (32nd ed. 2012).
[6] Endarterectomy: "excision of the thickened, atheromatous tunica intima of an artery." *Id.* at 616.
[7] Light work entails lifting a maximum of twenty pounds and frequently lifting or carrying up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b).

The Appeals Council declined to review the ALJ's findings and so notified Plaintiff on February 21, 2013. (DE 13, pp. 1–6). Plaintiff thereafter filed this complaint on April 16, 2013. (DE 1). Defendant's answer (DE 12) and the administrative record (DE 13) were filed on June 24, 2013. Plaintiff subsequently filed a motion and supporting memorandum for judgment on the administrative record on July 25, 2013. (DE 15, 16). After receiving two time extensions in which to respond, (DE 18, 20), Defendant filed a response on October 24, 2013. (DE 22). Plaintiff replied on November 13, 2013. (DE 24). The case is properly before the Court.

## II.   REVIEW OF THE RECORD

### A.  MEDICAL EVIDENCE

#### 1.  Middle Tennessee Mental Health

Middle Tennessee Mental Health in Nashville, Tennessee, treated Plaintiff for depression and a bipolar disorder from 2004 to 2007. (DE 13, p. 195). Following a suicide attempt in November 2006, Dr. Rudra Prakash M.D. and Dr. John Vernon M.D. diagnosed Plaintiff with depression, post-traumatic stress disorder, cannabis dependence, cocaine dependence, borderline intellectual functioning, hypertension, possible diabetes, history of head injury and seizure, history of alcohol neuropathy,[8] bilateral hearing loss, a global assessment of functioning ("GAF") of nineteen upon arrival and thirty upon discharge, and social environment, occupational, educational, and economic psychosocial stressors. (DE 13, pp. 249, 253, 274). Plaintiff suffered from a history of sexual and physical abuse which interfered with his sleeping patterns and manifested in visual and auditory hallucinations. (DE 13, p. 250). During the visit, Plaintiff exhibited appropriate and cooperative behavior, spoke normally, had a linear, logical,

---

[8] Neuropathy: "a functional disturbance or pathological change in the peripheral nervous system." Dorland's Illustrated Medical Dictionary 1268 (32nd ed. 2012).

and goal-directed thought process, possessed thoughts of suicidal ideation and both auditory and visual hallucinations, and displayed fair concentration and an intact memory. (DE 13, p. 252).

### 2. University Medical Center

The University Medical Center in Lebanon, Tennessee treated Plaintiff for depression, bipolar disorder, high blood pressure, and hearing loss from 2003 to 2011. (DE 13, pp. 195–196, 667). After Plaintiff failed a suicide attempt in December 2003, Dr. Lloyd Caudill M.D. performed a CT scan of Plaintiff's brain. (DE 13, p. 280). The scan showed no evidence of hemorrhage, mass effect, midline shift, or other abnormalities. (DE 13, p. 280). During that visit, Dr. Robert Jantz M.D. and Dr. Wayne O. Wells M.D. diagnosed Plaintiff with a suicide attempt, alcoholic intoxication, cocaine use, possible HIV, possible hepatitis C, and hypertension. (DE 13, pp. 286–289). Dr. Caudill later performed an MRI of Plaintiff's brain in January 2004, finding no evidence of stroke, mass effect, midline shift, abnormal enhancement, or abnormality. (DE 13, p. 294). He did, however, find minor ethmoidal[9] sinus disease with a retention cyst. (DE 13, p. 294).

Several months later, in April 2004, Dr. Caudill performed an MRI of Plaintiff's left knee, finding mild joint space effusion,[10] a Baker cyst,[11] and a complex tear of the posterior horn of the medial meniscus.[12] (DE 13, p. 295). Dr. Gregory White M.D. operated on Plaintiff later in the month, excising the medial meniscus tear and opening the cyst. (DE 13, pp. 297–298). Radiology tests performed by Dr. Caudill on Plaintiff's chest in April 2004 and July 2004, showed no abnormalities. (DE 13, pp. 296, 299).

---

[9] Ethmoidal: "of or pertaining to the ethmoid bone." *Id.* at 651.
[10] Effusion: "the escape of fluid into a part or tissue." *Id.* at 595.
[11] Baker cyst: "a swelling behind the knee, caused by escape of synovial fluid which becomes enclosed in a membranous sac." *Id.* at 458.
[12] Medial: "pertaining to the middle." *Id.* at 1118. Meniscus: "A crescent-shaped structure of the body. Often used alone to designate one of the menisci of the knee joints." *Id.* at 1134.

In October 2006, Dr. Scott Giles D.O. treated Plaintiff for suicidal ideation. (DE 13, pp. 300–304). A month later, Plaintiff was admitted to the clinic after an intentional drug overdose. (DE 13, pp. 307–310). Dr. Hardie Sorrels M.D. performed a cardiac exam on Plaintiff during that visit, noting that his heart rate was regular. (DE 13, p. 306). Dr. Wells treated Plaintiff in March 2007, concluding that Plaintiff suffered from alcohol dependency, marijuana use, hypertension, and suicidal and homicidal ideation. (DE 13, pp. 317–324). During this visit, Plaintiff was ineffectively coping after allegedly being robbed by his boyfriend. (DE 13, pp. 320, 322). At the end of October 2008, Plaintiff complained of weakness of his right side, paresthesia,[13] and slurred speech. (DE 13, pp. 373–400). After being examined by Dr. Wells, Plaintiff underwent a right carotid endarterectomy to treat severe right carotid stenosis. (DE 13, pp. 373–378). An MRI image suggested acute ischemia[14] and chronic gliosis.[15] (DE 13, pp. 388–389). Dr. Sorrels indicated this was possibly transient ischemic attack. (DE 13, p. 382).

Plaintiff next complained of chest pain in March 2010. (DE 13, p. 444). Following diagnostic tests, Dr. Marion McFarland M.D. was under the impression that Plaintiff suffered from atypical chest pain and chest wall pain. (DE 13, p. 446). A radiology test of Plaintiff's chest, however, revealed no abnormal findings. (DE 13, p. 449). In February 2011, Plaintiff complained of generalized weakness and indicated he had suffered a seizure earlier that day. (DE 13, pp. 594, 597). Diagnostic tests showed no clinically significant abnormalities. (DE 13, p. 595). Plaintiff again reported chest pain in mid-December 2011. (DE 13, p. 644). His echocardiogram was normal and showed no evidence of acute ischemia or injury. (DE 13, pp. 621, 646). Plaintiff's heart rate and blood pressure responses to Persantine and Nuclear stress

---

[13] Paresthesia: "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of external stimuli." *Id.* at 1383.
[14] Ischemia: "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel." *Id.* at 961.
[15] Gliosis: "an excess of astroglia in damaged areas of the central nervous system." *Id.* at 784.

tests were normal and did not present evidence of myocardial ischemia[16] or infarction.[17] (DE 13, pp. 623, 625, 682). A radiograph of Plaintiff's chest was normal and showed no acute cardiopulmonary disease. (DE 13, p. 627). The clinical impression was of a possible cardiac etiology.[18] (DE 13, p. 646). Plaintiff again complained of chest pain in late December 2011. (DE 13, p. 665). An echocardiogram showed a normal sinus rhythm and normal rate. (DE 13, p. 667). The tests reviewed were normal, and the clinical impression was of acute chest pain, gastroesophageal reflux disease, and acute gastritis.[19] (DE 13, pp. 667–668).

### 3. Wilson County Health Department

The Wilson County Health Department in Lebanon, Tennessee treated Plaintiff from August 31, 2009[20] to December 28, 2011. (DE 13, pp. 416–429, 508–544, 672–678). According to a report from August 2009, Plaintiff suffered from a bipolar disorder, hypertension, a hearing impairment, and a history of seizures with no recurrence. (DE 13, p. 417). At that time, Plaintiff had no problems sitting. (DE 13, p. 424). In a record from September 2009, it was noted that Plaintiff was doing well on bipolar medication and that Plaintiff had requested they fill out a disability form related to his mental state, not a mechanic dysfunction or significant physical disability. (DE 13, pp. 426–427). In September 2010, Plaintiff had a follow-up appointment after suffering a seizure. (DE 13, p. 515). Plaintiff later reported suffering a seizure in February 2011. (DE 13, p. 509).

---

[16] Myocardial ischemia: "deficiency of blood supply to the heart muscle, due to obstruction or constriction of the coronary arteries." *Id.* at 961.
[17] Infarct: "an area of coagulation necrosis in a tissue due to local ischemia resulting from obstruction of circulation to the area, most commonly by a thrombus or embolus." *Id.* at 934. An "infarction" is defined as an "infarct." *Id.*
[18] Etiology: "the causes or origin or a disease or disorder." *Id.* at 652. Thus, the pain suffered may have been caused by Plaintiff's heart.
[19] Acute gastritis: "acute inflammation of the gastric mucosa with edema, hyperemia, and infiltration by polymorphonuclear leukocytes." *Id.* at 762.
[20] Although Plaintiff listed his first visit to the Wilson County Health Department as occurring in May 2005 (DE 13, p. 196), the medical records provided only go back to August 31, 2009.

On April 8, 2011, Dr. Thomas Jaselskis M.D. reported in a Medical Source Statement that Plaintiff suffers from a seizure disorder, hearing loss, and bipolar disorder. (DE 13, p. 504). He further opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand for an hour in fifteen-minute intervals in an eight-hour workday, sit for four hours in two-hour intervals in a workday, and never work around dangerous equipment of operate a motor vehicle. (DE 13, p. 504). He also stated that Plaintiff could occasionally: bend, tolerate heat, cold, dust, smoke, or fumes, and that Plaintiff could frequently: balance, manipulate both hands, raise his arms, and tolerate noise exposure. (DE 13, p. 504). Dr. Jaselskis noted that Plaintiff's close vision was limited, he did not need to elevate his legs during the workday, he occasionally felt mild pain which interfered with his ability to concentrate, he would likely miss two days of work every month due to his impairments, medication side effects mildly affected Plaintiff's abilities to complete work-like functions, and Plaintiff suffered from mild fatigue. (DE 13, pp. 505, 507). He reported that Plaintiff suffered from complex partial seizures, rarely having convulsive seizures but having several non-convulsive seizures annually. (DE 13, p. 506). This assessment was prepared after reviewing Plaintiff's records and lab reports. (DE 13, p. 508). Later, on June 9, 2011, Dr. Jaselskis noted that Plaintiff's hypertension was controlled but that Plaintiff was suffering from knee pain, exhibiting medial joint line tenderness and minimal patellar crepitus[21] which might be from degenerative joint disease. (DE 13, p. 544).

### 4. Volunteer Behavioral Health Care System ("VBHCS")

From August 2009 to December 2011, Plaintiff sought treatment from the VBHCS in Lebanon, Tennessee. On August 19, 2009, Nurse Terre Ament noted that Plaintiff had been denied disability benefits and was re-applying for them. (DE 13, p. 561). She indicated that

---

[21] Joint crepitus: "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints." Dorland's Illustrated Medical Dictionary 429 (32nd ed. 2012).

Plaintiff's affect, thought content, and memory were normal, his speech and thought process were logical, and he was suicidal or violent but the risk was not immediate. (DE 13, p. 561). Although Plaintiff was depressed, his appearance was neat and clean, he was alert and oriented, and he could concentrate. (DE 13, p. 561). Plaintiff's GAF score was 60.[22] (DE 13, p. 562). On October 7, 2009, she noted he was not suicidal or violent. (DE 13, p. 563).

On October 7 and 8, 2009, Treating Professional Judith Pierce reported that Plaintiff met with her for the purpose of applying for SSDI. (DE 13, pp. 546–547). She noted that Plaintiff refused help in improving himself in other areas and seemed annoyed when she told him she could not complete his SSDI application forms. (DE 13, p. 547). On December 16, 2009, Plaintiff voiced his concerns regarding his attempt to obtain disability benefits and stated he had trouble sleeping because he heard someone calling his name and felt his bed jiggle. (DE 13, p. 565).

In March 2010, Plaintiff's new case manager, Pamela Smith, noted that Plaintiff was still seeking disability benefits and that Plaintiff would benefit from other services but was not interested in participating. (DE 13, p. 550). Plaintiff reported trouble sleeping for longer than three to four hours and stated that he heard voices and heard "ears popping." (DE 13, p. 567). When Ms. Smith met with Plaintiff in April 2010, Plaintiff again refused additional services and identified his sole goal as obtaining disability benefits. (DE 13, p. 551). Plaintiff reported that he slept well as a result of taking Lunesta. (DE 13, p. 569). Plaintiff's GAF at the meeting was 55. (DE 13 p. 570). On December 21, 2010, Plaintiff was described as "animated," and he reported that he had not suffered further seizures or depression. (DE 13, p. 573).

---

[22] A GAF score between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745 (6th Cir. 2007) (citation omitted).

In March 2011, Plaintiff stated he usually sleeps well, getting about six hours of sleep per night. (DE 13, p. 575). On June 23, 2011, Plaintiff stated he was doing well with his current medication and denied depression, anxiety, and irritability. (DE 13, p. 577). After a session with Nurse Ament on September 22, 2011, Plaintiff's affect was appropriate though sad; his appearance, speech, and thought content were normal; his mood was euthymic; his thought process was organized; and he was not suicidal. (DE 13, pp. 556–557). Nurse Ament listed Plaintiff's general medical conditions as a bilateral loss of hearing, seizure disorder, and hypertension. (DE 13, p. 558). Noting that Plaintiff's GAF was 55, Nurse Ament reported that Plaintiff has moderate environmental problems with regard to social relationships and access to health care services. (DE 13, p. 558). On December 21, 2011, Nurse Ament and Dr. John Cain M.D. presented Plaintiff's final report. (DE 13, pp. 585–590). Plaintiff's affect, appearance, speech, thought content, and memory were normal; Plaintiff's mood was euthymic; Plaintiff's thought process was organized; and Plaintiff was not suicidal. (DE 13, pp. 586–587).

## B. CONSULTATIVE ASSESSMENTS

### 1. Consultative Examination Report – Philip Barkley M.A.

Mr. Barkley from Barkley & Associates Incorporated in Murfreesboro, Tennessee examined Plaintiff on March 18, 2010. (DE 13, pp. 430–435). According to Mr. Barkley, Plaintiff was dressed and groomed appropriately, but Plaintiff had difficulty hearing because his hearing aids were broken. (DE 13, p. 430). Mr. Barkley noted that Plaintiff's ability to understand and remember was slightly limited; Plaintiff's ability to concentrate and persist were not significantly limited; Plaintiff's ability to interact in a socially appropriate manner was limited; and Plaintiff's ability to travel independently or adjust to environmental hazards was somewhat limited. (DE 13, p. 433). Additionally, Plaintiff would need his parents' assistance in

handling funds since Plaintiff had a history of substance abuse. (DE 13, p. 433). Mr. Barkley further found that Plaintiff suffered from recurrent and severe major depression with psychotic features and polysubstance abuse in reported remission. (DE 13, p. 434).

### 2. Consultative Examination Report – Dr. Roy Johnson M.D.

Dr. Johnson from Lebanon, Tennessee examined Plaintiff on March 31, 2010, after which he opined that Plaintiff suffered from hypertension, angina, diabetes, depression, and a hearing deficit. (DE 13, pp. 452–455). He concluded that Plaintiff could occasionally lift thirty to forty pounds, had no sit/stand restrictions, and should avoid safety-sensitive areas that require adequate hearing until his hearing aids were repaired. (DE 13, p. 455).

### 3. Medical Evaluation, Psychiatric Review, Mental RFC – Dr. Mason Currey Ph.D.

On April 13, 2010, Dr. Currey completed a medical evaluation, psychiatric review technique, and mental RFC assessment of Plaintiff. (DE 13, pp. 456–459, 460–468, 474–477). Dr. Currey first noted that Plaintiff's conditions had not changed significantly since the ALJ's 2009 finding of "not disabled." (DE 13, p. 457). Agreeing with the 2009 opinion, Dr. Currey explained that Plaintiff's claims were not fully credible since the severity alleged was not supported by evidence which only indicated moderate functional impairments. (DE 13, pp. 457, 459). Dr. George T. Davis Ph.D. affirmed this assessment on August 9, 2010. (DE 13, p. 502).

Dr. Currey next concluded that Plaintiff's impairments did not meet the diagnostic criteria for a 12.04 Affective Disorder, a 12.08 Personality Disorder, or a 12.09 Substance Addiction Disorder. (DE 13, pp. 460–468). In assessing the "B" criteria of the listings, Dr. Currey noted that Plaintiff is mildly limited in activities of daily living; moderately limited in maintaining social functioning, concentration, and persistence or pace; and not limited by

episodes of decompensation of extended duration. (DE 13, p. 470). Plaintiff did not fulfill the "C" criteria. (DE 13, p. 471).

In evaluating Plaintiff's mental RFC, Dr. Currey noted that Plaintiff was not significantly limited in his abilities to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out short, simple instructions; (3) sustain an ordinary routine without special supervision; (4) make simple work-related decisions; (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) ask simple questions or request assistance; (7) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (8) be aware of normal hazards and take appropriate precautions; and (9) travel in unfamiliar places or use public transportation. (DE 13, pp. 474–475). Dr. Currey indicated that Plaintiff experienced moderate limitations in his abilities to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (8) respond appropriately to changes in the work setting; and (9) set realistic goals or make plans independently of others. (DE 13, pp. 474–475).

### 4. Consultative Examination Report – Dr. Tania Williams Au.D.

Dr. Williams from the Brentwood Hearing and Hearing Aid Center in Nashville, Tennessee, performed an audiological evaluation on Plaintiff on June 8, 2010. (DE 13, pp. 482–

484). She reported that Plaintiff experiences intermittent tinnitus and unsteadiness, moderate to moderately severe hearing loss in his left ear, and moderately severe to severe hearing loss in his right ear. (DE 13, pp. 483–484). Dr. Williams recommended that Plaintiff complete a new hearing aid fitting and participate in annual audiological evaluations. (DE 13, p. 484).

**5.  Medical Evaluation and Physical RFC – Dr. Kanika Chaudhuri M.D.**

On July 8, 2010, Dr. Chaudhuri completed a DDS Medical Consultant Analysis, adopting the ALJ's 2009 findings. (DE 13, pp. 485–488). Dr. Carolyn M. Parrish M.D. affirmed this assessment on September 5, 2010. (DE 13, p. 503). Dr. Chaudhuri also completed a Physical RFC Assessment, finding no exertional, postural, manipulative, or visual limitations. (DE 13, pp. 490–492). Plaintiff's hearing and exposure to noise were limited, and Plaintiff needed to avoid all exposure to hazards. (DE 13, p. 493).

**6.  Vocational Examiner – S.L. Coleman**

On July 9, 2010, Mr. Coleman noted that Plaintiff does not suffer from postural, manipulative, or visual limitations. (DE 13, p. 215). Mr. Coleman further noted that Plaintiff's hearing ability was limited and that he should avoid concentrated exposure to noise and all exposure to hazards. (DE 13, p. 215). Plaintiff was moderately limited in his ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) work in coordination with or proximity to others without being distracted by them, (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (6) respond appropriately to changes in the work setting, and (7) set realistic goals or make plans independently of others. (DE 13, p. 215). Mr. Coleman concluded that Plaintiff should adjust to other work, including that of (1) a

moisture tester for wood-working (light work, specific vocational preparation ("SVP")[23] rating of 2), (2) a poultry vaccinator (medium work, SVP 2), or (3) a painter (medium work, SVP 2). (DE 13, p. 217).

### 7. Vocational Examiner – Kyle Mask

In his reported dated September 7, 2010, Mr. Mask made the same findings as Mr. Coleman. (DE 13, pp. 233–235). Mr. Mask listed different occupations available to Plaintiff including those of (1) warehouse worker (medium work, SVP 2), (2) packer of agricultural produce (medium work, SVP 2), and (3) garment folder (light work, SVP 2). (DE 13, p. 235).

## C. PLAINTIFF'S TESTIMONY

Plaintiff last worked on October 31, 2007. (DE 13, p. 44).[24] He completed the twelfth grade and has not completed specialized job training, trade, or vocational school. (DE 13, p. 191). On a typical day, Plaintiff stays in the house, watches television, and helps his mother clean. (DE 13, pp. 55, 207). His mother reminds him to shave, and he needs reminders to take his medicine. (DE 13, p. 209). He makes his bed, bathes himself, and goes outside. (DE 13, pp. 209–210). Plaintiff stated he does not go out alone because he might have a "spell." (DE 13, p. 210). He accompanies his mother shopping for food, and he can count change. (DE 13, p. 210). His hobbies and interests include watching television and playing with dogs which he does for half of the day. (DE 13, p. 211). Plaintiff spends time with his parents daily, and he regularly visits Save-A-Lot and the doctor's office. (DE 13, p. 211).

At the administrative hearing, Plaintiff wore a hearing amplifier. (DE 13, p. 47). According to Plaintiff, he can only hear individuals when looking at them, cannot hear behind him, and high-pitched sounds bother him. (DE 13, pp. 47–48). Difficulties communicating with

---

[23] SVP refers to the time required to prepare for a specific vocation.
[24] Though Plaintiff testified that he last held a job on October 31, 2006 (DE 13, p. 44), Plaintiff's earnings statement suggests he was employed in 2007. (DE 13, p. 180).

others confuse and upset Plaintiff, and he would be distracted from his work if he had to focus on what co-workers and supervisors were saying in a normal factory environment. (DE 13, p. 48). Plaintiff further stated his last strong seizure was around November 2010 and that an increased medicine dosage helped prevent seizures. (DE 13, pp. 49–50). Due to his seizure disorder, Plaintiff cannot drive and cannot operate or be close to heavy machinery. (DE 13, p. 49). Plaintiff testified that after his carotid endarterectomy he becomes weak and naps three times a day for an hour and a half to two hours. (DE 13, pp. 50–51). According to Plaintiff, he can only stand for fifteen to twenty minutes and sit for less than four hours in an eight-hour day. (DE 13, pp. 51–52). Regarding Plaintiff's bipolar disorder, Plaintiff stated that it prevents him from concentrating for an hour or more, an example of which was his inability to begin and finish cleaning his house within the same day. (DE 13, pp. 53–54). Plaintiff stated that he has trouble being around other people because he argues with them and that his bipolar disorder results in depression and suicidal thoughts twice a month. (DE 13, pp. 54–55).

## D.  VOCATIONAL EXPERT'S TESTIMONY

The VE testified that Plaintiff last held a job as a restaurant cook (medium strength, skilled, SVP 5) and dishwasher (medium strength, unskilled, SVP 2). (DE 13, p. 44). Plaintiff had previously worked as a salvage worker (medium strength, unskilled, SVP 2), an electrician helper (medium strength, semi-skilled, SVP 3), and as a construction worker (heavy strength, semi-skilled, SVP 4. (DE 13, pp. 44–45).

Considering the RFC ultimately adopted by the ALJ, the VE determined that Plaintiff could not perform past work. (DE 13, p. 56). Plaintiff could, however, complete about 400 of the 1,600 possible unskilled, light jobs, including that of: gluer and assembler of gaskets, medical drapes, samples, and paper products. (DE 13, pp. 56–57). The VE stated that there are 1,200

gluer jobs within a 90-mile radius of Nashville, Tennessee, and a quarter million of those jobs in the national economy. (DE 13, p. 57). Plaintiff could also serve as a warehouse checker, and there are 2,400 of those jobs in the greater Nashville area and 240,000 nationally. (DE 13, p. 57).

If the foregoing functional capacity was further limited by Plaintiff needing to miss an average of two days of work per month, the VE stated that the absences would not be tolerated. (DE 13, pp. 64–65). Further, if the VE found Plaintiff's testimony credible, Plaintiff could not perform any work because of his hearing problems, variable moods, inability to complete tasks, and fatigue. (DE 13, pp. 57–58). When considering the limitations described by Plaintiff's treating physician, Dr. Jaselskis, the VE stated that the individual could not perform any work. (DE 13, pp. 63–64).

### III.    CONCLUSIONS OF LAW

#### A.  STANDARD OF REVIEW

This Court reviews the record as a whole to determine whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ made those findings in accordance with the correct legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). "Substantial evidence is less than a preponderance but more than a scintilla." *Id.* The ALJ's decision shall be upheld if the evidence in the record is such that a "reasonable mind might accept [it] as adequate to support a conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013), reh'g denied (May 2, 2013). This is true even when substantial evidence favors an opposite conclusion. *Id.* Failure to follow the proper legal standards, however, implies a lack of substantial evidence. *Id.*

## B. PROCEEDINGS AT THE ADMINISTRATIVE LEVEL

A claimant is "disabled" within the meaning of the Act if an extended medically determinable physical or mental impairment prevents him from engaging in SGA. 42 U.S.C. §§ 1381a; 1382c(a)(3)(A). The SSA assesses disability under a five-step test:

(1) If the claimant is engaged in SGA, the claimant is not disabled.

(2) If the claimant's physical or mental impairment, or combination of impairments, is not severe or does not meet the duration requirement, the claimant is not disabled.

(3) If the claimant's impairment(s) meets or equals a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1, the claimant is presumed disabled, and the inquiry ends.

(4) Based on the claimant's RFC, if the claimant can still perform past relevant work, the claimant is not disabled.

(5) If the claimant's RFC, age, education, and work experience indicate that the claimant can perform other work, the claimant is not disabled.

20 C.F.R. § 416.920(a)(4).

From step one through step four, the burden of proof is on the claimant. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). At step five, the burden shifts to the Commissioner, who may meet this burden by "identify[ing a] significant number of jobs in the economy that accommodate the claimant's [RFC] and vocational profile." *Id.*

## C. PLAINTIFF'S STATEMENT OF ERRORS

Plaintiff contends that (1) the ALJ gave inadequate weight to the treating physician's opinion, (2) the ALJ's credibility decisions are not supported by substantial evidence, and (3) the ALJ's determination that Plaintiff could perform a range of sedentary[25] work is erroneous. (DE 16, pp. 9–17). As Plaintiff's first claim of error is meritorious and requires remand, review of the remaining claims is unnecessary.

---

[25] As the ALJ concluded that Plaintiff could perform a range of *light work* (DE 13, p. 28), it appears that Plaintiff's reference to *sedentary work* is a typographical error.

### D. Weight Given to Dr. Jaselskis' Opinion

Plaintiff first alleges that the ALJ failed to give appropriate weight to Dr. Jaselskis' opinion, rendering the ALJ's RFC determination without substantial weight. (DE 16, p. 10). Defendant does not challenge Dr. Jaselskis' status as a treating physician. (DE 22, p. 6).

#### 1. The Treating Physician Rule & Good Reason Requirement

Treating physicians' opinions are granted weight under a two-step inquiry. At the outset, a treating physician's opinions regarding the nature and severity of the claimant's impairments are generally granted great weight. 20 C.F.R. § 416.927(c)(2). Moreover, controlling weight is owed to these opinions if they are (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) are "not inconsistent with the other substantial evidence in [the] case record." *Id.* If the ALJ gives a treating physician's opinion lesser weight, the ALJ cannot simply reject the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011). Rather, the ALJ must continue to the next step and give the opinion weight based on the following factors: the "length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c)(2).

No matter how much weight the ALJ gives the treating physician's opinion, the ALJ must support the decision with "good reasons." 20 C.F.R. § 416.927(c)(2). Further, if the ALJ does not give controlling weight to the treating physician's opinions, the ALJ must provide "specific reasons for the weight given . . . , supported by the evidence in the case record, and [the explanation] must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

Social Security Regulation ("SSR") 96-2P (S.S.A. 1996); *see also Gentry*, 741 F.3d at 727. This requirement serves two purposes: "to let claimants understand the disposition of their cases . . . [and to facilitate] meaningful review of the ALJ's application of the [treating physician] rule." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). Failure to provide good reasons "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record" and may require remand. *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007)); *see also Gayheart*, 710 F.3d at 380.

Conclusory assertions that a treating physician's opinions "are not well-supported by any objective findings . . . and are . . . inconsistent with other credible evidence" are too ambiguous to satisfy the good reasons requirement. *Gayheart*, 710 F.3d at 376. Likewise, an ALJ's statement that "there is no basis for [the treating physician's opinion] . . . is not sufficiently specific to meet the requirements of the rule on its face, inasmuch as it neither identifies the objective clinical findings at issue nor discusses their inconsistency with [the treating physician's] opinion." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (internal quotations omitted). Similarly, an ALJ's statement that the treating physician's opinion "did not merit controlling weight because '[the physician's] opinion is not supported by her own examinations of the claimant or those of other treating and examining sources'" was insufficient. *Kennedy v. Comm'r of Soc. Sec.*, 965 F. Supp. 2d 937, 942 (E.D. Tenn. 2013).

The ALJ must make "some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 552; *see also Gayheart*, 710 F.3d at 377. Specificity is a necessity, for a general reference to the "treatment notes and clinical findings . . . beg[s] the question 'what treatment notes? what clinical findings?'" *Smith v. Comm'r of Soc. Sec.*, 5:13 CV 870, 2014 WL 1944247,

at *6 (N.D. Ohio May 14, 2014). Though the ALJ does not need to "discuss every piece of evidence, he must 'build a logical bridge from the evidence to the conclusion.' . . . [and] make some effort to identify specific discrepancies." *Id.* at *7. This review is limited to the ALJ's assessment, and "[t]he Commissioner's *post hoc* arguments on judicial review are immaterial." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 830 (N.D. Ohio 2013).

### 2. The ALJ Failed to Provide Good Reasons for Rejecting Dr. Jaselskis' Opinion

In characterizing Plaintiff's RFC, the ALJ found with respect to Dr. Jaselskis' opinion:

> Thomas Jaselskis, M.D., a *treating physician* at the Wilson County Health Department opined in April 2011 that the claimant could lift 20 pounds occasionally and 10 pounds frequently, stand for 1 hour, 15 minutes at one time, and sit for 4 hours, 2 hours at one time. He could occasionally bend, tolerate temperature extremes, tolerate dust, smoke, and fumes; he could frequently stoop, balance, perform gross and fine manipulation, and raise his arms over his shoulders. He could frequently tolerate noise exposure. He could never work around dangerous equipment or operate a motor vehicle. He had limited close vision. He experienced only mild and only occasionally experienced pain that would interfere with concentration. He would only miss two days per month and had only mild medication side effects and fatigue. He did have complex partial seizures on a rare basis and non-convulsive[26] seizures a few times a year. *I find this opinion to be unsupported by the record as a whole and by the Wilson County Health Department records in particular. Additionally, the claimant was seen by[27] multiple providers during these office[28] visits and there is little, if any, objective evidence in these records to support such limited functional restrictions. Therefore, I give this opinion little weight.*

(DE 13, p. 31) (emphasis added).

Without referencing specific clinical findings or discrepancies, the ALJ failed to provide good reasons for rejecting Dr. Jaselskis' opinion. *See Friend*, 375 F. App'x at 551–52. Though the ALJ may be correct that the objective evidence did not support the limitations reported by Dr. Jaselskis, meaningful judicial review is not feasible based upon this ambiguous two-sentence dismissal. *See Gayheart*, 710 F.3d at 376. What, for instance, in the record contradicted Dr.

---

[26] The ALJ's report contained a typographical error.
[27] The ALJ's report contained a typographical error.
[28] The ALJ's report contained a typographical error.

Jaselskis' opinion that Plaintiff would miss work two times per month? Referencing the health records retained by Wilson County Health Department and the record as a whole does not assist this Court's review, nor does it help Plaintiff understand the reason for dismissing Dr. Jaselskis' opinion. *See Blakley*, 581 F.3d at 407.

Further, after denying Dr. Jaselskis' opinion controlling weight, the ALJ neglected to apply the weight-balancing factors as required by 20 C.F.R. § 416.927(c).[29] The ALJ noted that he gave Dr. Jaselskis' opinion "little weight," but it is unclear what impact the 20 C.F.R. § 416.927(c) factors had on this decision. Again, it may be true that Dr. Jaselskis' opinion should be granted little weight, but the ALJ failed to reach this conclusion using the required analysis.

### 3. The Harmless Error Doctrine

The Court "does not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion." *Gayheart*, 710 F.3d at 380 (quoting *Cole*, 661 F.3d at 939). Remand may not be necessary; however, if the Commissioner's error was *de minimis* or harmless, such as when

> (1) "the treating source's opinion is so patently deficient that the Commissioner could not possibly credit it,"
>
> (2) the Commissioner's findings were consistent with or adopted those of the treating physician, or
>
> (3) if the Commissioner ultimately met the regulation's goal.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Gayheart*, 710 F.3d at 380.

With respect to the third exception, "[s]o long as the decision permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's

---

[29] As Plaintiff's brief emphasizes, Dr. Jaselskis treated Plaintiff for nearly three years, seeing Plaintiff on over thirty-five occasions. (DE 16, p. 13).

opinion, we look past such procedural errors." *Francis v. Comm'r Soc. Sec.*, 414 F. App'x 802, 805 (6th Cir. 2011) (citation and internal quotations omitted); *see also Cole*, 661 F.3d at 939; *Wilson*, 378 F.3d at 544. The ALJ may *indirectly* attack the treating physician's opinion's supportability or consistency in (1) the ALJ's assessment of the physician's other opinions or (2) through the ALJ's general analysis of the impairment. *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2005).

The error is harmful, however, when the court cannot meaningfully review the ALJ's decision, such as when the ALJ's rationale is ambiguous or unclear. *Blakley*, 581 F.3d at 409; *Bowen*, 478 F.3d at 748–50; *Hall*, 148 F. App'x at 464.

### 4. The ALJ Committed Harmful Error

Despite the ALJ's attempt to concisely reject Dr. Jaselskis' opinion, only providing two sentences to explain the reasons for the weight given, meaningful judicial review is precluded by this brevity. As discussed in connection with the "good reason" requirement, it is unclear which records weaken Dr. Jaselskis' opinion and which records undermine particular limitations contained therein.

The remaining two exceptions outlined in *Wilson* are also unavailing in this instance. *See* 378 F.3d at 547. First, Dr. Jaselskis' opinion was not consistent with that of the ALJ. Perhaps the most significant distinction between the ALJ's RFC and Dr. Jaselskis' opinion is whether Plaintiff's impairments would cause him to miss two days of work every month. As the VE stated in the administrative hearing, missing work twice a month "could not be tolerated by any employer that would offer unskilled, light jobs." (DE 13, p. 64). The ALJ's RFC did not include this restriction (DE 13, p. 28), but Dr. Jaselskis reported the limitation. (DE 13, p. 505).

Furthermore, Dr. Jaselskis' opinion was not so deficient that the ALJ could not give it credit; it was based on Dr. Jaselskis' review of Plaintiff's medical records and diagnostic tests spanning approximately three years. (DE 13, p. 508).

The harmless error exceptions do not apply, and therefore the ALJ's failure to (1) articulate good reasons for the weight given to Dr. Jaselskis' opinion and (2) failure to apply the 20 C.F.R. § 416.927(c) factors in weighing the opinion resulted in harmful error. Without understanding the appropriate weight owed to Dr. Jasleskis' opinion, this Court cannot conclude that substantial evidence supports the ALJ's ultimate decision that Plaintiff is not disabled. Rigorous application of the "good reason" requirement is needed to ensure that this "important procedural safeguard" is not eroded by substantive "substantial evidence" arguments. *Wilson*, 378 F.3d at 547. Otherwise, the Commissioner would possess "the ability t[o] violate the regulation with impunity and render the protections promised therein illusory." *Id.* at 546.

## IV.     RECOMMENDATION

For the reasons stated above, the undersigned recommends that Plaintiff's motion for judgment on the administrative record (DE 15) be **GRANTED**, the Commissioner's decision be **VACATED**, and that the case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

Within fourteen (14) days from receipt of this Report and Recommendation, the parties may serve and file written objections to the findings and recommendations made herein. Fed. R. Civ. P. 72(b)(2). Parties opposing the objections must respond within fourteen (14) days from service of these objections. *Id.* Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v.*

*Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

**ENTERED** this the 3rd day of June, 2014,


/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge